# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JOHN SCHNATTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2018-0542-AGB |
| | ) | |
| PAPA JOHN'S INTERNATIONAL, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted:  November 30, 2018
Date Decided:  January 15, 2019

Peter B. Ladig, Brett M. McCartney, and Elizabeth A. Powers, BAYARD, P.A., Wilmington, Delaware; Garland A. Kelley, GLASER WEIL LLP, Los Angeles, California, *Attorneys for Plaintiff*.

Blake Rohrbacher, Robert L. Burns, Brian F. Morris, and Kevin M. Regan, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware, *Attorneys for Defendant*.

**BOUCHARD, C.**

In November 2017, John Schnatter, the founder of Papa John's International, Inc., criticized the National Football League's handling of the dispute between NFL players and owners over national anthem protests during a call held to report the company's earnings. Some in the media portrayed Schnatter's comments about the NFL as racial in nature. In July 2018, Forbes reported that Schnatter used a racial slur during an internal diversity training exercise at the company in May 2018.

On the same day the Forbes article was published, the company's board asked Schnatter to resign as its Chairman, which he did. Over the next few days, the board also asked Schnatter to resign as a director of the company, which he declined to do. The board then established a special committee to investigate all of the company's relationships with Schnatter. Within three hours of its formation, the special committee decided to terminate two agreements the company had with Schnatter.

In the wake of these events, Schnatter made a demand under 8 *Del. C.* § 220 in his capacity as a director of the company to inspect seventeen categories of documents. Perplexed about why the company made no effort to defend him as the founder and longstanding public face of the company from what he believes was unfair treatment by the media, and why the company instead seemed intent on abruptly cutting ties with him without investigating the matter, Schnatter questions whether his fellow directors fulfilled their fiduciary obligations.

1

The parties have resolved their disputes concerning thirteen of the seventeen categories of documents sought in Schnatter's demand. In this post-trial decision, the court concludes that the company failed to prove that Schnatter's purpose for seeking to inspect the remaining four categories of documents is improper and that he therefore is entitled to inspect these documents subject to certain limitations.

## I.    BACKGROUND

The facts recited in this opinion are the court's findings based on the testimony and documentary evidence presented at a one-day trial held on October 1, 2018. The record includes stipulations of fact made in the Pre-trial Stipulation and Order ("PTO"), over 100 trial exhibits, and testimony from one fact witness: John Schnatter. Although the company bore the burden of proof to show that Schnatter's purpose was improper, it did not call any other witnesses to testify at trial.

### A.    The Parties

Schnatter is the founder of Papa John's International, Inc. ("Papa John's" or the "Company").[1] Since around 1993, Schnatter has served as a member of the Company's board of directors (the "Board").[2] Until recently, Schnatter served as the Company's Chairman of the Board, Chief Executive Officer, and spokesman.[3]

---

[1] PTO ¶ 12 (Dkt. 47).

[2] PTO ¶ 13.

[3] PTO ¶¶ 21, 26; JX 2.

2

He is the Company's largest stockholder, owning approximately 30% of the outstanding shares.

Papa John's is a Delaware corporation and currently the third-largest pizza delivery and take-out company in the world.[4] Its Board currently consists of six members, including Schnatter. The other five directors are Mark S. Shapiro, Sonya Medina, Olivia Kirtley, Christopher Coleman, and Laurette Koellner.[5] Since January 1, 2018, Steve Ritchie has served as the Company's President and CEO.[6]

### B. Schnatter Comments on the NFL and Resigns as CEO

On October 31, 2017, the Company announced that it had hired Laundry Service, a marketing agency, as its new creative agency of record to handle the creative aspects of the Company's marketing and some of its purchases of advertising time.[7] Ritchie, the Company's Chief Operating Officer at the time, was responsible for hiring Laundry Service.[8]

On November 1, 2017, Schnatter participated in a call to report on the Company's earnings (the "Earnings Call"). At the time, the Company was the

---

[4] PTO ¶ 14.

[5] PTO ¶ 15.

[6] PTO ¶ 17.

[7] JX 4 at 1; Tr. 22.

[8] Tr. 10, 20.

official pizza sponsor of the National Football League.[9]  On the Earnings Call, Schnatter made the following comments:

> Now to the NFL.  The NFL has hurt us.  And more importantly, by not resolving the current debacle to the player and owners' satisfaction, NFL leadership has hurt Papa John's shareholders.  Let me explain. The NFL has been a long and valued partner over the years, but we are certainly disappointed that [the] NFL and its leadership did not resolve the ongoing situation to the satisfaction of all parties long ago.  This should have been nipped in the bud 1.5 years ago.  Like many sponsors, we are in contact with [the] NFL.  And once the issues [are] resolved between the players and the owners, we are optimistic that [the] NFL's best years are ahead, but good or bad, leadership starts at the top.  And this is an example of poor leadership.[10]

These comments were part of a script for the call that was reviewed by Lance Tucker, the Company's then-Chief Financial Officer, and Steve Ritchie.[11]  Ritchie asked Schnatter not to make comments regarding the NFL during the call but, according to Schnatter, Ritchie lacked the authority to prevent him from doing so.[12] Later in the call, Ritchie told an analyst that "the NFL situation" was applying "pressure" to the Company's sales.[13]  He also told another analyst that Schnatter's

---

[9] PTO ¶ 20.

[10] Tr. 8-9; JX 6 at 5.

[11] Tr. 10.

[12] Tr. 10-11, 47, 171-72.

[13] JX 6 at 8.

contention about the NFL "controversy" hurting the Company's business was a "great point."[14]

Schnatter's comments during the Earnings Call were the subject of significant public criticism. Forbes reported that Papa John's "received significant flak after Schnatter declared on an earnings call that national anthem protests in the National Football League were partially to blame for slow sales at the company."[15] Yahoo! Finance wrote that Schnatter's comments on the Earnings Call were seen as "a desperate effort to find someone else to blame" and "sparked a backlash."[16]

Schnatter testified that the media took his comments "so far out of context so quickly" that the reaction appeared "premeditated."[17] Schnatter spoke to Company personnel, including Ritchie, about clarifying what he had said during the Earnings Call. According to Schnatter, Ritchie advised him to "lay low" and not "do anything," and the Company made minimal effort to change the public's perception of what he had said, instead blaming its declining sales on Schnatter's comments for the next two months.[18]

---

[14] JX 6 at 19; Tr. 172-73.

[15] JX 8 at 2.

[16] JX 11 at 3.

[17] Tr. 16.

[18] Tr. 18-20.

On December 31, 2017, Schnatter resigned as CEO of the Company.[19] On February 27, 2018, the NFL terminated its sponsorship with Papa John's. The next day, the NFL announced that Pizza Hut would be its new pizza sponsor. Papa John's stock price declined significantly when this news was announced.[20]

## C. Schnatter Resigns as Chairman After the Training Exercise

On May 14, 2018, Schnatter attended a meeting with Laundry Service in New York to discuss the creative plan it was proposing for the Company.[21] One of the proposals Laundry Service "was adamant" about was to put Kanye West in ads for Papa John's with Schnatter.[22] A few days later, Schnatter told Laundry Service he was not comfortable with this proposal after he did some research and learned that Kanye West used the N-word in his lyrics.[23]

On May 22, 2018, Schnatter, Ritchie, and two others participated from the Company's corporate offices in a telephonic media training exercise about diversity that was held with executives from Laundry Service (the "Training Exercise").[24] Schnatter was not informed before the call that he would be asked questions about

---

[19] PTO ¶ 21.

[20] JX 10 at 1.

[21] Tr. 23-24.

[22] Tr. 24-25.

[23] Tr. 25-26; *see also* JX 23 at 1.

[24] Tr. 165-66; PTO ¶ 23.

race.[25]  The Training Exercise began with a handout of questions that were not provided to Schnatter in advance, the first of which was: "Are you a racist?"[26]  After about forty minutes of questioning, including questions Schnatter viewed as insinuating that his comments about the NFL were racial in nature, Schnatter used the N-word during the Training Exercise.  As he recounted at trial:  "Well, I said, 'Colonel Sanders uses the N-word.  I don't use the N-word, and we're not going to use the N-word.'"[27]  The next day, Papa John's and Laundry Service mutually agreed to terminate their relationship.[28]

On July 11, 2018, Forbes published an article about the Training Exercise, entitled "Papa John's Founder Used N-Word on Conference Call" (the "Forbes Article").[29]  The Forbes Article reported that Schnatter was engaged in a role-playing exercise in which he "was asked how he would distance himself from racist groups online" following his comments about the NFL.[30]  According to the Forbes Article, Schnatter tried to downplay the significance of his NFL comments by saying (using the entire racial slur) that "Colonel Sanders called blacks n-----s" yet "never faced

---

[25] Tr. 27.

[26] Tr. 27-28.

[27] Tr. 28-29.

[28] PTO ¶ 24.

[29] PTO ¶ 25; JX 12.

[30] JX 12 at 1-2.

7

public backlash."[31] The Forbes Article also reported that Schnatter wrote in an emailed statement on the afternoon of July 11 that "reports attributing the use of inappropriate and hurtful language to me during a media training session regarding race are true. Regardless of the context, I apologize. Simply stated, racism has no place in our society."[32]

Later on July 11, after the Forbes Article came out, Schnatter resigned as Chairman of the Board at the request of the Board.[33] Within a few days after the Forbes Article was published, some professional sports teams and organizations cut ties with Papa John's.[34]

On July 13, 2018, during a radio interview, Schnatter reportedly asserted that "he was pressured to use the N-word during the" Training Exercise: "The agency was promoting that vocabulary . . . . They pushed me. And it upset me."[35] The next day, on July 14, Schnatter sent a letter to the Board disputing the Company's portrayal of his comments from the Training Exercise.[36] According to Schnatter, the

---

[31] JX 12 at 2 (internal quotation marks omitted); Tr. 29.

[32] JX 12 at 2.

[33] PTO ¶ 26; Tr. 37.

[34] *See* JX 15, 18, 21.

[35] JX 17 at 2.

[36] PTO ¶ 29.

Company did nothing "to set forth the truth so that the press could correctly report what occurred[.]"[37]

On July 15, 2018, Kirtley, the Company's lead director, requested that Schnatter also resign as a director but he declined to do so.[38] Kirtley told Schnatter that he was not "designated or authorized to speak or make appearances on behalf of the Company."[39]

At around this time, Schnatter sent a letter to the other Board members in which he asserted that the Forbes Article "mischaracterized" what happened during the Training Exercise, that his use of the N-word was "in no way racist," and that the Company "completely mishandled the NFL situation."[40] He further asserted that Laundry Service had engaged in an "extortion attempt" to extract $1.2 million from the Company when its contract was terminated, that it was a "mistake" for him to resign as Chairman, and that "corporate governance experts" believed the Board had acted improperly in asking him to step down as Chairman and as a director "without any investigation."[41]

---

[37] Tr. 37.

[38] PTO ¶ 27; JX 36; Tr. 38.

[39] PTO ¶ 28.

[40] JX 23 at 1.

[41] JX 23 at 1-2.

## D. The Board Forms a Special Committee

On July 15, 2018, before a Board meeting scheduled for later that day, Schnatter learned that the Board might form a special committee when he received an updated agenda for the meeting.[42] Schnatter's counsel (Glaser Weil LLP) wrote to the Board before the meeting, asserting that the Board "has no authority to remove Mr. Schnatter as a director" under Delaware law, that the Board had failed to act in the best interests of the Company by allowing Schnatter's comments to be misconstrued, and that its failure to conduct a full investigation could result in the Board breaching its fiduciary duties.[43]

The Board meeting on July 15 (the "July 15 Meeting") began at around 8:15 p.m.[44] About fifteen minutes later, the Board approved a set of resolutions establishing a special committee (the "Special Committee") consisting of all the directors other than Schnatter, *i.e.*, Shapiro, Medina, Kirtley, Coleman, and Koellner.[45] The Special Committee was given "exclusive power and authority" to review, and make determinations about, all of the relationships between Schnatter and the Company.[46] Akin Gump Strauss Hauer & Feld LLP was retained as the

---

[42] Schnatter Dep. 223-24.

[43] JX 26 at 1-2.

[44] PTO ¶ 30.

[45] PTO ¶¶ 31, 16.

[46] PTO ¶ 32; JX 25 at 3-5.

Special Committee's counsel.[47]   The Company contacted Akin Gump two days earlier, on July 13, to discuss its representation of the not-yet-formed Special Committee, and formally authorized the representation on July 15, 2018.[48]   It is unclear what, if anything, Akin Gump did during that two-day window in connection with its representation.

The Special Committee met later on the evening of July 15.[49]   At approximately 11:23 p.m., a lawyer with a law firm representing the Company (Hogan Lovells US LLP) emailed Schnatter notices of the Company's intent to terminate two agreements it had with Schnatter:  (1) an Agreement for Service as Founder (the "Founder's Agreement") and (2) a Sublease Agreement governing Schnatter's use of some office space at the Company's headquarters (the "Sublease Agreement").[50]

After the July 15 meetings, counsel for Schnatter and Papa John's exchanged letters.  On July 16, 2018, Akin Gump wrote to Glaser Weil, explaining that "neither the Board nor the Special Committee has taken any action to remove Mr. Schnatter as a member of the Board" and that "all actions taken by the Special Committee in

---

[47] PTO ¶ 18.

[48] JX 80 at 8.

[49] PTO ¶¶ 30-33.

[50] PTO ¶ 34; JX 2; JX 3.

this matter . . . have been in the best interests of the Company and its shareholders."[51]
The letter also stated that "the Special Committee will oversee an external audit and investigation of the Company's existing processes, policies and systems related to diversity and inclusion, supplier and vendor engagement and the Company's culture."[52] Glaser Weil replied on July 18, 2018, arguing that the Company's purported termination of the Founder's and Sublease Agreements violated the terms of those agreements and stating that "we fully expect that as part of the review conducted by the Special Committee, it will interview Mr. Schnatter."[53]

### E. Schnatter Makes a Section 220 Demand and Files Suit

On July 18, 2018, Schnatter delivered to the Company and its registered agent a demand under 8 *Del. C.* § 220(d) (the "Demand") to inspect the following seventeen categories of the Company's books and records:

> 1. Communications with and between Counsel to the Company and any officer or director of the Company from October 31, 2017 through the formation of the Special Committee at the July 15, 2018 meeting of the Board of Directors (the "July 15 Meeting") referring or relating to me. For purposes of this Demand, Counsel shall mean any outside counsel to the Company, including without limitation, Hogan Lovells US LLP, Gibson Dunn & Crutcher, LLP, in-house counsel to the Company, and any counsel representing any director in connection with such director's service on the Board of Directors (the "Board").

---

[51] JX 30 at 1.

[52] JX 30 at 2.

[53] JX 37 at 3.

2.      Communications between or among directors, and/or any director and Counsel from October 31, 2017 through the July 15 Meeting relating to the article on Forbes.com's website published on or about 5:00 a.m. on July 11, 2018 referring to me (the "Forbes Article").

3.      Communications between or among directors, and/or any director and Counsel from October 31, 2017 through the July 15 Meeting referring or relating to me.

4.      Communications between or among directors and Counsel from October 31, 2017 through the July 15 Meeting referring or relating to Schnatter Group Arrangements as that term is defined in the resolutions adopted at the July 15 Meeting appointing the Special Committee (the "July 15 Resolutions").

5.      Documents reflecting notice to me that the Independent Directors had retained separate legal representation in connection with their service on the Board.  For purposes of this Demand, the term Independent Directors means Olivia F. Kirtley, Christopher L. Coleman, Laurette T. Koellner, Sonya E. Medina, and Mark S. Shapiro.

6.      Communications between or among directors or officers, Counsel and/or Akin Gump LLP prior to the July 15 Meeting, including without limitations all drafts of the July 15 Resolutions and the Special Committee Charter.

7.      Any engagement letter between the Independent Directors and Akin Gump LLP prior to formation of the Special Committee.

8.      The engagement letter between the Special Committee and Akin Gump.

9.      The minutes of all meetings of the Board and any committees thereof from October 31, 2017 through and including the July 15 Meeting.

10.     All materials provided to the Independent Directors in connection with the July 15 Meeting.

13

11.  The minutes of any meeting of the Special Committee.

12.  All materials provided to the Special Committee in connection with the meeting of the Special Committee held on or about July 15, 2018.

13.  Communications between or among directors and Counsel referring to [*sic*] relating to my membership on the Board from October 31, 2017 to the present.

14.  All documents referring or relating to any allegations of sexual harassment or other sexual misconduct and innuendo by any member of the Board or any Section 16 officers including without limitation all communications received or sent by the Company or any officer or director of the Company referring or relating to such allegations.

15.  All documents referring or relating to the Company's relationship with Laundry Service, including without limitation all communications between the Company, Laundry Service, Casey Wasserman, and/or any companies (including their employees) affiliated with Casey Wasserman and any engagement letter between the Company and Laundry Service.

16.  Any contracts, agreements or understandings between me and any of my affiliates and the Company.

17.  Any settlement agreements or non-disclosure agreements involving me or my affiliates in the possession, custody or control of the Company.[54]

Regarding his purpose for making the Demand, Schnatter wrote: "The purpose of my demand is to inform myself so that I may fulfill my fiduciary duties and ensure

---

[54] JX 35 at 1-3.

14

that the other members of the Board are fulfilling their fiduciary duties as well."[55]

On July 25, 2018, the Company sent a response that largely rejected the Demand.[56]

### F.     The Conflict Between Schnatter and the Company Continues

On July 27, 2018, counsel for the Papa John's Franchisee Association wrote to the Board to officially complain about Schnatter's use of the N-word.  The letter asserted that this was "not the first time Mr. Schnatter has engaged in offensive and damaging behavior," noting the NFL-related comments and comments pertaining to the Affordable Care Act.[57]

In August 2018, Schnatter created a website—savepapajohns.com—where he posts information, including filings in this action, about what he views as the Company's unfair efforts to marginalize him.[58]

On August 5, 2018, the New York Post published an article describing the relationship between Schnatter and Ritchie.[59]  The article describes how Schnatter was complimentary of Ritchie when Ritchie was named as CEO on January 1, 2018, but that his confidence in Ritchie changed six months later, after two disappointing

---

[55] JX 35 at 3.

[56] PTO ¶ 37; JX 53.

[57] JX 32 at 1.

[58] PTO ¶ 39.

[59] JX 66.

quarters.[60]  The article goes on to suggest that Ritchie organized a coup to oust Schnatter from the Company after he learned that Schnatter had prepared a negative performance review of him and that Schnatter was planning to recommend to the Board that he be removed from the CEO position.[61]  According to the article, one of the reasons Schnatter filed his Section 220 action was to "prove Ritchie got hold of his evaluation."[62]  Schnatter testified that "Steve knew that [the] evaluation was going to be subpar and that [he] was going to terminate him."[63]

On August 7, 2018, the Company issued its second-quarter earnings report, "which revealed a 25% decline in earnings per share over last year's numbers and falling sales both domestically and abroad."[64]  That same day, Schnatter released a public statement saying he was concerned about the Company's sales and the "direction the Company [is] headed under the stewardship of Steve Ritchie and the current board of directors."[65]

On August 17, 2018, Schnatter wrote a letter to the Company's Senior Vice President for Global Human Resources with the subject line "Inappropriate Conduct

---

[60] JX 66 at 2.

[61] JX 66 at 2.

[62] JX 66 at 2.

[63] Tr. 184.

[64] JX 71 at 1.

[65] PTO ¶ 41.

16

By Members of the Company's Leadership Team."[66]  In the letter, Schnatter asserts that a "'fraternity'-like environment" exists at the Company and that Ritchie is primarily responsible for creating it.[67]  The letter includes five exhibits, which are mainly notes and letters created by Company employees that describe a range of inappropriate conduct by Ritchie, Mark Shapiro (a director), and others.[68]

On August 28, 2018, Schnatter gave an interview with CNN's business division.  In discussing Papa John's recent poor financial performance, Schnatter stated that "[y]ou can't blame everything on two comments.  I wish I had that kind of power, but I don't."[69]  Schnatter further commented that the Company needed "new leadership" because Ritchie was "struggl[ing] as a CEO."[70]  At trial, Schnatter presented a graph that purports to correlate the Company's declining financial performance with Ritchie's tenure as CEO.[71]

On August 29, 2018, the Special Committee issued a press release stating that Schnatter "has demonstrated a continued pattern of ignoring decisions of the Board, both in his role as CEO and as non-executive Chairman of the Board."[72]  The Special

---

[66] PTO ¶ 42; JX 76.

[67] JX 76 at 1.

[68] JX 76 at 5-61.

[69] JX 88 at 1.

[70] JX 88 at 1.

[71] JX 202.

[72] JX 90 at 1.

17

Committee provided several examples, including that the "Board specifically directed John Schnatter not to talk about the NFL controversy related to the National Anthem" but he did so anyway, and that Schnatter "misinformed the Board about the circumstances surrounding the termination of the Company's relationship with Laundry Service."[73]

On September 12, 2018, Schnatter publicly accused the Company of "hiding documents that, we believe, will disclose the actual facts as to what is occurring here, including use of Mr. Schnatter as a scapegoat to cover up their own shortcomings and failures."[74] Schnatter also testified that a fellow director, Mark Shapiro, has benefitted from the Company's efforts to cut ties with him because a company Shapiro owns is now doing advertising business with Papa John's, which Schnatter would not have permitted.[75]

### G. Schnatter Files a Derivative Complaint

On August 30, 2018, Schnatter filed a second action in this court against Ritchie and the five members of the Board who serve on the Special Committee, asserting five claims for breach of fiduciary duty, four derivatively (Counts I-IV) and a fifth directly (Count V) (the "Fiduciary Action"). Count I asserted that Ritchie

---

[73] JX 90 at 1.

[74] PTO ¶ 44.

[75] Tr. 76, 182-83.

breached his fiduciary duty of loyalty as an officer of the Company by launching "a false and defamatory campaign against Mr. Schnatter, falsely accusing him of racism, after Mr. Ritchie learned that he was going to lose his job."[76] Counts II-IV asserted that the members of the Special Committee breached their fiduciary duties of care or loyalty in various ways.[77] Count V asserted that the Special Committee defendants breached their fiduciary duties by adopting a shareholder rights plan in July 2018.[78]

On September 21, 2018, Schnatter amended his complaint in the Fiduciary Action to drop the claim against Ritchie. Schnatter later stated his intention to amend his complaint a second time to withdraw the three claims asserted against the Special Committee defendants (Counts II-IV), but he has not yet sought to do so.[79]

## II. PROCEDURAL HISTORY

On July 26, 2018, after the Company had largely rejected his Demand, Schnatter filed this action. The Complaint contains a single claim seeking an order requiring the Company to permit inspection of the books and records sought in the Demand. On September 4, 2018, the Company moved to dismiss the Complaint for failure to state a claim for relief, which the court denied on September 20.

---

[76] JX 92 ¶ 74.

[77] JX 92 ¶¶ 77-99.

[78] JX 92 ¶¶ 100-06.

[79] Def.'s Reply Br. Ex. B (Dkt. 58).

Following a one-day trial held on October 1, 2018, the court heard post-trial argument on November 16, 2018. Based on various positions the parties advanced during the argument suggesting that their disputes had been narrowed, the court asked the parties to meet and confer to explore a resolution. On November 30, 2018, the parties informed the court that they had resolved the open issues concerning thirteen of the seventeen categories of documents requested in the Demand and that the only issues that remain unresolved pertain to Requests Nos. 1-4.[80] The court has only a partial understanding of how the parties resolved the issues concerning the thirteen categories of documents no longer in dispute.

## III. ANALYSIS

The Delaware General Corporation Law provides that a "director shall have the right to examine the corporation's . . . books and records for a purpose reasonably related to the director's position as a director."[81] "A director who has a proper purpose . . . has virtually unfettered rights to inspect books and records," which afford "access at least equal to that of the remainder of the board."[82] "The public policy underlying that rule is plain: a director charged with fiduciary obligations to

---

[80] Dkt. 63.

[81] 8 *Del. C.* § 220(d).

[82] *Chammas v. NavLink, Inc.*, 2016 WL 767714, at *6 (Del. Ch. Feb. 1, 2016) (citations and internal quotation marks omitted).

protect and preserve a corporation must have access to the corporation's books and records if he reasonably can be expected to perform his duties."[83]

A "director seeking inspection of books and records makes out a *prima facie* case when he shows that he is a director, he has demanded inspection and his demand has been refused."[84] At that point, the "defendant corporation bears the burden of proving that any such inspection is for an improper purpose."[85] The burden of proof under Section 220 is a "preponderance of the evidence."[86] "[P]roof by a preponderance of the evidence means that something is more likely than not."[87]

A director's purpose is not automatically rendered improper "because of the possibility that he may abuse his position as a director and make information available to persons hostile to the Corporation or otherwise not entitled to it. If [a director] does violate his fiduciary duty in this regard, then the Corporation has its remedy in the courts."[88] If it is established, however, that a director's "motives are

[83] *Bizzari v. Suburban Waste Servs., Inc.*, 2016 WL 4540292, at *8 (Del. Ch. Aug. 30, 2016).

[84] *Id.* (citation and internal quotation marks omitted); *see also Holdgreiwe v. Nostalgia Network, Inc.*, 1993 WL 144604, at *3 (Del. Ch. Apr. 29, 1993) (same).

[85] *Chammas*, 2016 WL 767714, at *6.

[86] *Seinfeld v. Verizon Commc'ns, Inc.*, 909 A.2d 117, 121 (Del. 2006) (defining burden of proof as preponderance of evidence for 220(b) proceedings); *see also Sec. First Corp. v. U.S. Die Casting & Dev. Co.*, 687 A.2d 563, 567 (Del. 1997) (same).

[87] *Physiotherapy Corp. v. Moncure*, 2018 WL 1256492, at *3 (Del. Ch. Mar. 12, 2018) (citation and internal quotation marks omitted).

[88] *Henshaw v. Am. Cement Corp.*, 252 A.2d 125, 129 (Del. Ch. 1969).

improper, or that they are in derogation to the interest of the corporation, then his right to inspect ceases to exist."[89]

The following analysis proceeds in three parts. The court begins by determining the propriety of Schnatter's purpose for seeking inspection of documents. After concluding that the Company has failed to prove by a preponderance of the evidence that his purpose is improper, the court considers the appropriate scope for Schnatter's inspection of documents. Finally, the court addresses the Company's arguments to impose conditions on the production of documents to Schnatter.

## A.     The Propriety of Schnatter's Purpose for the Demand

The record plainly shows that Schnatter is a director of the Company, that he made the Demand to inspect books and records of the Company under Section 220(d), and that the Company largely rejected his Demand.[90] As such, because the Company challenges the propriety of Schnatter's purpose for making the Demand, the Company bears the burden of proving by a preponderance of the evidence that Schnatter's purpose is not "reasonably related to [his] position as a director."[91]

---

[89] *Holdgreiwe*, 1993 WL 144604, at *3 (citation omitted).

[90] *See* JX 35 (demanding production of seventeen categories of documents); JX 53 at 1-2 (stating that "the Company would be justified in rejecting the Demand in its entirety" and offering significantly fewer categories of documents than were requested).

[91] 8 *Del. C*. § 220(d).

### 1.     Schnatter's Stated Purpose for Making the Demand

The stated purpose for which Schnatter made his Demand has been the subject of some confusion.  In his Demand, Schnatter stated:  "The purpose of my demand is to inform myself so that I may fulfill my fiduciary duties and ensure that the other members of the Board are fulfilling their fiduciary duties as well."[92]  The use of the introductory phrase "[t]he purpose" suggests that Schnatter has a single purpose.  One reasonably could read the balance of the sentence, however, to describe two potentially distinct purposes:  first, to ensure that Schnatter is fulfilling his own fiduciary duties, and second, to ensure that the other directors have fulfilled their fiduciary duties.

In response to an interrogatory, Schnatter stated that "his only purpose is set forth in the Demand:  to investigate whether members of the Board have breached their fiduciary duties to the Company and its stockholders."[93]  Shortly before trial, Schnatter purported to amend this interrogatory response to state that, "consistent with his Demand and his deposition testimony, his purposes are to inform himself so that he may fulfill his fiduciary duties and ensure that the other members of the Board are fulfilling their fiduciary duties as well."[94]

---

[92] JX 35 at 3.

[93] JX 79 at 13.

[94] JX 201 at 6.   The Company requests that the court strike Schnatter's amended interrogatory response given that he reconfirmed his original response at trial and no

23

At trial, Schnatter stood by his original interrogatory response when asked about the purpose of his Demand.[95] Schnatter then elaborated on redirect that "to investigate" in this context means to "gain knowledge, to inform yourself, to have insight. I mean, investigate means to get to the bottom of something and know what's going on."[96] By post-trial argument, Schnatter's counsel took the position that the two purposes apparent in the Demand "are one and the same, and they both seek to investigate potential mismanagement."[97]

In sum, although Schnatter's explanations of his purpose have varied, I find that the stated purpose for his Demand boils down to a single purpose: to investigate mismanagement of the Company by the other members of the Board. Both parties now agree on this.[98] "It is well established that investigation of mismanagement is a proper purpose for a Section 220 books and records inspection."[99]

---

testimony was elicited at trial about his amended response. Def.'s Opening Br. 24. Given that the amended response is referenced only for purposes of background, this request is denied.

[95] Tr. 66-67.

[96] Tr. 182.

[97] Post-Trial Tr. 70.

[98] *See* Post-Trial Tr. 70, 110.

[99] *Sec. First Corp.*, 687 A.2d at 567.

### 2. The Company Has Failed to Prove that Schnatter's Purpose Is Not Reasonably Related to His Position as a Director

The Company argues that "Schnatter is not seeking documents for a purpose reasonably related to his position as a *director*" on the theory that he actually "is seeking documents that relate to his *individual* status as John Schnatter—founder and stockholder and former Chairman and CEO of the Company."[100] In other words, according to the Company, Schnatter's stated purpose for the Demand is a pretext and his actual purpose is personal and thus improper.

The Company gives four reasons in support of this contention: (1) Schnatter's Demand seeks "mostly documents about himself;"[101] (2) his Complaint concedes that he "sought to inspect documents because of the unexplained and heavy-handed way in which the Company has treated him since the publication of" the Forbes Article;[102] (3) he conceded at trial that he wants to "get hold of documents he feels will clear him and his reputation;"[103] and (4) he "appears to be seeking documents to further his current fiduciary suit or to pursue another fiduciary suit."[104] The court will address the first three reasons together and then turn to the fourth reason.

---

[100] Def.'s Opening Br. 17.

[101] Def.'s Opening Br. 17.

[102] Compl. ¶ 1 (Dkt. 1).

[103] Tr. 77-79.

[104] Def.'s Opening Br. 18.

### a. The Company Has Failed to Prove that Schnatter's Purpose Is Improper Because It Is Personal

The first three reasons fundamentally say the same thing: Schnatter's actual purpose for making the Demand is personal and therefore improper under Section 220. Although Schnatter's interests as a director and as an individual often overlap because of the unique public role he has played at the Company for many years, the Company has failed in my opinion to meet its burden of showing that Schnatter's actual purpose for making the Demand is personal and thus not reasonably related to his position as a director.

Schnatter is the founder and largest stockholder of the Company. Over the course of his thirty-four-year career with the Company, he held virtually every position—from cook and dishwasher to CEO—and, critically, he became the public face of the Company in its marketing efforts on television and in print.[105] Given his unique role as the Company's longstanding public spokesman, Schnatter's concerns that the Company made no effort to defend him in response to the controversies arising from his comments about the NFL and the publication of the Forbes Article, and that the Company instead appeared intent on abruptly severing ties with him, are relevant concerns that any director, including Schnatter, would have about the Company's management and oversight.

---

[105] Tr. 6-7. *See* JX 2 at 1 (Founder's Agreement stating that Schnatter "will," among other things, "participate in commercials and other high profile public relations events").

Additionally, having listened carefully to Schnatter's testimony about how these events unfolded and having observed his demeanor at trial,[106] I find that Schnatter's Demand arose from a genuine desire to investigate whether the other members of the Board had fulfilled their fiduciary obligations in handling the controversies during the period leading up to the July 15 Meeting.[107] Schnatter testified, for example, that he was taken aback by the swiftness of the media to portray his comments about the NFL as racial in nature, and that he felt ambushed and pressured during the Training Exercise, which led to the Forbes Article. Whether or not Schnatter's perceptions of those events are accurate, he testified credibly that he had those perceptions, which lends credence to his concern that it was inappropriate for the Board to ask him to resign as Chairman and as a director within a few days of the publication of the Forbes Article and before the Board had conducted an investigation or interviewed him.

---

[106] *See supra* Section I.B-C.

[107] The Company argues that "Schnatter must show 'ample evidence that [he] has a bona fide need to inspect the corporate records in order to ensure that [management] has not engaged in any mismanagement of [the Company].'" Def.'s Opening Br. 25 (quoting *Holdgreiwe*, 1993 WL 144604, at *4). This quotation of *Holdgreiwe* mischaracterizes its holding. Although the court in *Holdgreiwe* noted as a factual matter that there was "ample evidence" the director in question had a bona fide need to inspect corporate records, it did not hold as a legal matter that the director bore the burden of showing ample evidence of mismanagement to justify his inspection. Such a proposition would be at odds with the burden of proof the statute places on the corporation when a director makes an inspection demand. *See* 8 *Del. C*. § 220(d) ("The burden of proof shall be upon the corporation to establish that the inspection such director seeks is for an improper purpose.").

27

To be sure, there is a personal element to the concerns Schnatter testified about because they also pertain to his reputation as an individual. But that fact does not negate that these concerns are legitimate corporate concerns, particularly given that Schnatter's image and standing has been inextricably intertwined with the Company's public persona for decades. In short, I find that the Company has failed to prove that Schnatter's purpose for the Demand is not reasonably related to his position as a director. I reject the Company's theory that his actual purpose is to obtain documents to advance his personal interests, although I recognize that the documents sought in the Demand may be important to him personally as well.

> **b.** **The Company Has Failed to Prove that Schnatter's Purpose Is Improper Based on His Filing of the Fiduciary Action**

The fourth reason the Company cites to prove that Schnatter's purpose is improper is that he "appears to be seeking documents to further his current fiduciary suit or to pursue another fiduciary suit."[108] Delaware courts have recognized that a stockholder who files a plenary action asserting claims of mismanagement undercuts his alleged need to obtain documents under Section 220 to investigate the same alleged acts of mismanagement.[109]

---

[108] Def.'s Opening Br. 18.

[109] *Bizzari*, 2016 WL 4540292, at *6 (holding that need for documents sought in inspection demand to investigate mismanagement and wrongdoing was undercut by filing of pending plenary action challenging same conduct); *Cent. Laborers Pension Fund v. News Corp.*, 2011 WL 6224538, at *2 (Del. Ch. Nov. 30, 2011) (holding that stockholder was "unable

The rationale for this rule was most recently explained in *Bizzari v. Suburban Waste Services, Inc.*[110] In that case, Louis Bizzari, the founder of Suburban Waste Services, Inc. and its parent company, Felt Properties, LLC, made a demand to inspect documents of both entities in two different capacities: (1) as a stockholder of Suburban and as a member of Felt, and (2) as a director and a manager of those companies, respectively. Recognizing that the standards governing his demands varied depending on Bizzari's capacity, the court was careful to analyze Bizzari's "demand as a stockholder/member separately from his demand as a director/manager."[111]

In analyzing Bizzari's demand as a stockholder and member, the court noted that, after trial in his inspection action, Bizzari had filed a plenary action concerning efforts to remove him as a director and manager and to sell certain assets of Suburban

---

to tender a proper purpose for pursuing its efforts to inspect" books and records given that its "currently-pending derivative action necessarily reflects its view that it had sufficient grounds for alleging both demand futility and its substantive claims without the need for the assistance afforded by Section 220"); *see also King v. VeriFone Hldgs., Inc.*, 12 A.3d 1140, 1148 (Del. 2011) (acknowledging that dismissal of later-filed Section 220 action was proper when the "stockholder-plaintiff's plenary derivative complaint was still pending and the plenary court had not granted the plaintiff leave to amend"); *Baca v. Insight Enters., Inc.*, 2010 WL 2219715, at *4 (Del. Ch. June 3, 2010) ("[A] stockholder does not act with a proper purpose when the stockholder attempts to use Section 220 to investigate matters that the same stockholder already put at issue in a plenary derivative action."); *Taubenfeld v. Marriott Int'l, Inc.*, 2003 WL 22682323, at *3 (Del. Ch. Oct. 28, 2003) (noting that filing a derivative complaint "was a certification under Rule 11 that the plaintiffs had enough information to support their allegations").

[110] 2016 WL 4540292.

[111] *Id*. at *4.

without his consent.  The court concluded that Bizzari had "failed to meet his burden of establishing a credible basis to investigate possible mismanagement or wrongdoing."[112]  With respect to the subject matter of the plenary action, the court reasoned that, by filing the plenary action, "Bizzari and his counsel presumably concluded they possessed sufficient information under Rule 11 to file the complaint without first inspecting books and records."[113]  Thus, as the court further explained, Bizzari "effectively conceded that the books and records he seeks are not necessary or essential to his stated purpose of investigating mismanagement or wrongdoing with respect to the removal or asset sale issues."[114]

In analyzing Bizzari's demand as a director and manager, the court made no mention of Bizzari's filing of his plenary action or the impact that filing could have on obtaining documents in his capacity as a director and manager.  The court instead focused on evidence showing that "Bizzari's conduct during the last year had been entirely inconsistent with [Suburban's] interests."[115]  In particular, the court found that Bizzari "demonstrated a willingness to compete directly with Suburban" and "remains motivated to do so as a result of his extreme anger and resentment of

---

[112] *Id.* at *6.

[113] *Id.*

[114] *Id.*

[115] *Id.* at *8.

30

[Suburban's] other two principals."[116] Relying on this evidence, the court concluded that Suburban had carried its "rather substantial burden of proving that [Bizzari's] demand to inspect books and records in his capacity as a director and manager is not motivated by a proper purpose."[117]

Here, in challenging the propriety of Schnatter's purpose based on his filing of the Fiduciary Action, the Company focuses on one aspect of one claim in the Fiduciary Action where Schnatter alleges that the members of the Special Committee breached their fiduciary duty of care by terminating the Founder's and Sublease Agreements almost immediately after the Special Committee was formed. The core supporting allegation appears in Count II of the original complaint in the Fiduciary Action. It states, in relevant part:

> In violation of this duty of care, the Special Committee acted within less than three hours of its formation to terminate two Schnatter-related agreements. The Board could not have possibly met its obligation to consider all information reasonably available before invalidly terminating those agreements. Nor has the Board cured this flaw in its decision-making process.[118]

---

[116] *Id.* at *8-9.

[117] *Id.* at *1.

[118] Derivative Compl. ¶ 79 (C.A. No. 2018-0646) (Dkt. 1). The Company makes no argument that the other matters raised in the five claims of the original complaint concern the same subject matter as Requests Nos. 1-4.

In my opinion, the Company has not met its burden to prove that Schnatter's purpose for seeking the documents described in Requests Nos. 1-4 is improper based on the assertion of this narrow claim in the Fiduciary Action for two reasons.

First, there are fundamental differences between inspection demands made by stockholders and those made by directors. A stockholder seeking to inspect books and records (other than a stock ledger or list of stockholders) not only bears the burden of proving that her demand is proper, *i.e.*, reasonably related to her interests as a stockholder,[119] but also must demonstrate that the documents she seeks are "*necessary and essential* to satisfy [her] stated purpose."[120] As *Bizzari* explains, a stockholder seeking documents under Section 220 to investigate claims of mismanagement undercuts her ability to make the second showing by asserting claims in a plenary action challenging the same alleged acts of mismanagement.

By contrast, a director "who has a proper purpose is entitled to virtually unfettered access to the books and records of the corporation,"[121] and it is the

[119] 8 *Del. C.* § 220(c).

[120] *Pershing Square, L.P. v. Ceridian Corp.*, 923 A.2d 810, 816 (Del. Ch. 2007) (emphasis added); *see also Polygon Glob. Opportunities Master Fund v. West Corp.*, 2006 WL 2947486, at *3 (Del. Ch. Oct. 12, 2006) (finding stockholder plaintiff stated proper purpose of valuing its shares but denying inspection because it had "all 'necessary and essential' information from public filings"); *Marathon P'rs, L.P. v. M&F Worldwide Corp.*, 2004 WL 1728604, at *4 (Del. Ch. July 30, 2004) ("The scope of inspection should be circumscribed with precision and limited to those documents that are necessary, essential and sufficient to the stockholder's purpose.").

[121] *McGowan v. Empress Entm't, Inc.*, 791 A.2d 1, 5 (Del. Ch. 2000) (Jacobs, V.C.).

corporation's burden to prove that the director's purpose is improper, *i.e.*, not "reasonably related to the director's position as a director."[122] And, importantly, standing to bring a claim on behalf of the corporation has not been extended to a director under Delaware law.[123] Thus, if Schnatter obtains documents in response to the Demand, he may use them internally at the Company to advance his point of view, but he may not use them to pursue a derivative claim unilaterally. Presumably recognizing this limitation, Schnatter has represented he will not use any documents produced in response to the Demand to assert a claim as a stockholder without first obtaining the Company's consent to do so.[124]

No authority has been brought to the court's attention in which *a director's* right to access books and records under Section 220(d) has been denied based on his filing of a plenary claim *as a stockholder*. *Bizzari* is not that case. Given (i) the lack of any such authority, (ii) the significant differences in our law between inspection demands made by stockholders and those made by directors, (iii) the fact that a director lacks standing to assert derivative claims in that capacity, and (iv) the fact that Schnatter has agreed not to use any documents produced in response to the Demand to file a claim as a stockholder without the Company's consent, I see no

---

[122] 8 *Del. C.* § 220(d).

[123] *Schoon v. Smith*, 953 A.2d 196, 199 (Del. 2008).

[124] *See* Post-Trial Tr. 72, 110-11, 119-20.

33

basis to deny Schnatter access to the documents described in Requests Nos. 1-4 based on his filing of the Fiduciary Action.

Second, even if one were to ignore the distinctions discussed above concerning inspection demands made by directors as opposed to stockholders, it would not be appropriate in my view to deem Schnatter's filing of a claim challenging the Special Committee's exercise of its duty of care in a very limited respect—*i.e.*, its alleged failure to inform itself during the three hours after it was formed—to be a concession that Schnatter does not need the documents sought in Requests Nos. 1-4 to investigate mismanagement. Each of those requests only seeks documents pertaining to a time period before the Special Committee was formed, *i.e.*, from November 1, 2017 until the July 15 Meeting. And even if such documents were relevant to Schnatter's due care claim (*e.g.*, by showing that the directors had become informed about the Sublease and Founder's Agreements *before* the Special Committee was formed), Schnatter has not asserted a loyalty claim relating to the termination of those agreements and thus could not be said to have conceded that he has sufficient information to do so. In short, the Company has not proven that the acts of mismanagement Schnatter seeks to investigate through his Demand necessarily concern the *same* conduct he put at issue in the Fiduciary Action.

### c. The Company Has Failed to Prove that Schnatter's Purpose Is Improper Based on His Alleged Lack of Familiarity with the Demand

Apart from the four reasons already discussed, the Company contends that Schnatter's purpose is improper because he "had no idea" why he is seeking many of the documents requested in the Demand.[125] For support, the Company relies on *Wilkinson v. A. Schulman, Inc.*[126] In that case, the court found that a stockholder who had served as a plaintiff for an "entrepreneurial law firm" in at least seven lawsuits did not have a proper purpose for inspecting a corporation's books and records.[127] The court reasoned that "the purposes for the inspection belonged to" the law firm, which (i) initiated the process, (ii) drafted "a demand to investigate different issues than what motivated the stockholder to respond to the law firm's solicitation," and (iii) pursued the inspection and litigation "with only minor and non-substantive involvement from the ostensible stockholder principal."[128]

---

[125] Def.'s Opening Br. 20. The Company also contends that Schnatter's "varying sworn testimony" concerning the stated purpose for his Demand proves that he has no proper purpose. *Id.* 22-24. I disagree. As discussed above (*see supra* Section III.A.1), there was some confusion about Schnatter's stated purpose, but the asserted variations in Schnatter's testimony are overblown and largely explainable by the reality that, in order to investigate mismanagement by others, a director must first become informed himself about the underlying facts and circumstances.

[126] 2017 WL 5289553 (Del. Ch. Nov. 13, 2017).

[127] *Id.* at *2-3.

[128] *Id.*

This case bears no resemblance to *Wilkinson*. Here, a director of a corporation with a presumptive right to access corporate books and records made an inspection demand in response to a specific sequence of events, *i.e.*, the Company's handling of the fallout from the Earnings Call and Forbes Article. The record here does not support the conclusion that Schnatter was so disengaged from the process that the actual purpose for the Demand was to benefit his counsel.[129]

* * * * *

For the reasons explained above, the court finds that the Company has failed to prove that Schnatter's purpose for making the Demand is not reasonably related to his position as a director of the Company. The court turns next to determining the appropriate scope of the inspection to which Schnatter is entitled.

## B. Scope of Production

"If [a director's] inspection of [a corporation's] records is to effectuate its purpose of enabling him to determine whether management wrongdoing has occurred, his access to [the corporation's] records must necessarily be broad and unrestricted."[130] At the same time, even a director "must direct the Court to specific

---

[129] Contrary to the Company's portrayal, Schnatter was conversant in many details about the Demand. *See, e.g.*, Schnatter Dep. 62 (explaining why date range in Demand was chosen); Schnatter Dep. 105 (explaining why he seeks certain documents related to formation of Special Committee).

[130] *Holdgreiwe*, 1993 WL 144604, at *7 (granting plaintiff-director's requests "fully and completely").

books and records related to the [director's] proper purpose. Without such direction, the Court is unable to direct production of an appropriate set of documents, and unwilling to burden the corporation to search for the same."[131]

As discussed previously, only Requests Nos. 1-4 remain in dispute. To reiterate, those requests seek:

1.  Communications with and between Counsel to the Company and any officer or director of the Company from October 31, 2017 through the formation of the Special Committee at the July 15, 2018 meeting of the Board of Directors (the "July 15 Meeting") referring or relating to me. For purposes of this Demand, Counsel shall mean any outside counsel to the Company, including without limitation, Hogan Lovells US LLP, Gibson Dunn & Crutcher, LLP, in-house counsel to the Company, and any counsel representing any director in connection with such director's service on the Board of Directors (the "Board").

2.  Communications between or among directors, and/or any director and Counsel from October 31, 2017 through the July 15 Meeting relating to the article on Forbes.com's website published on or about 5:00 a.m. on July 11, 2018 referring to me (the "Forbes Article").

3.  Communications between or among directors, and/or any director and Counsel from October 31, 2017 through the July 15 Meeting referring or relating to me.

4.  Communications between or among directors and Counsel from October 31, 2017 through the July 15 Meeting referring or relating to Schnatter Group Arrangements as that term is defined in the resolutions adopted at the July 15 Meeting appointing the Special Committee (the "July 15 Resolutions").

---

[131] *Chammas*, 2016 WL 767714, at *8 n.98.

Although the term "Counsel" is defined in the Demand to include any personal counsel "representing any director in connection with such director's service" on the Board, Schnatter no longer seeks such communications and their production will not be required.[132] Schnatter also has limited the potential custodians to the following: the other directors, Ritchie, and Caroline Oyler, the Company's General Counsel.[133] This list is reasonable. I also find that the time period covered by Requests Nos. 1-4 is reasonable. Each request covers a limited period of less than nine months that begins with the Earnings Call, when the concerns to which Schnatter testified began to arise, and ends with the formation of the Special Committee.

As stated, however, Requests Nos. 1-4 are overbroad relative to the attested purpose for the Demand in one key respect. For example, to the extent those requests seek communications "referring or relating" to Schnatter without further qualification (*e.g.*, Requests Nos. 1 and 3), they are not sufficiently related to Schnatter's purpose of investigating mismanagement and must be narrowed. In my opinion, Schnatter is entitled to the communications sought in Requests Nos. 1-4 only to the extent such communications reflect any consideration of changing Schnatter's relationship with the Company, which would include assessments of his

---

[132] Post-Trial Tr. 78.

[133] *See* Dkt. 63 at 2; Post-Trial Tr. 84-85.

behavior or performance in his various roles at the Company (*e.g.*, as a director, officer, or spokesman), during the specified time period.

Two issues remain concerning the scope of production: (i) Schnatter's request to obtain emails and text messages from personal accounts and devices, and (ii) privileged communications. These issues are addressed, in turn, below.

### 1. Production of Emails and Text Messages from Personal Accounts and Devices

Schnatter requests access to emails and text messages from personal accounts and stored on personal devices. In *Indiana Electrical Workers Pension Trust Fund IBEW v. Wal-Mart Stores, Inc.*, a stockholder sought to inspect emails and other documents stored on the directors' personal devices concerning the board's handling of a bribery scandal involving Wal-Mart's Mexican division.[134] Then-Chancellor Strine ordered production, observing that a director usually owes an obligation to the corporation "to share that information with the company when the company needs it."[135] Subsequently, this court has both granted and denied access to personal email accounts and devices of directors and officers in Section 220 actions.[136]

---

[134] C.A. No. 7779-CS, at 81, 97 (Del. Ch. May 20, 2013) (Strine, C.) (TRANSCRIPT).

[135] *Id*. at 98.

[136] *Compare Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 792-93 (Del. Ch. 2016) (granting access to CEO's personal email account), *with In re Lululemon Athletica Inc. 220 Litig.*, 2015 WL 1957196, at *6-7 (Del. Ch. Apr. 30, 2015) (denying access to directors' personal email accounts).

In opposing Schnatter's request for emails and text messages from personal accounts and devices, the Company relies on *Chammas v. NavLink, Inc.*[137] In that case, two directors of NavLink who suspected that other board members had been meeting without them sought access under Section 220(d) to certain communications between or among management, the board Chairman, and/or any of the other board members during a defined period.[138] In rejecting this request, the court explained:

> Mere suspicions of pre-meeting collusion among board members or board members and management, in the context of a Section 220 action, is insufficient to compel the production of private communications between such officers and directors, even to the extent that such communications are stored on the defendant company's servers. While directors' access to company books and records is broader than that of stockholders, the requested information itself must qualify as a book or record of the company before the Court will order its production.[139]

The *Chammas* court then articulated a three-part test for determining when a request for communications among corporate directors and officers may be produced in response to a Section 220 demand:

> The Court notes that while this holding is not to be interpreted as a blanket prohibition against inspection of private communications among directors, subjecting Section 220 proceedings to such broad requests, even by directors, runs contrary to the 'summary nature of a Section 220 proceeding.' As such, any request for communications among corporate directors and officers must (1) state a proper purpose, (2) encompass communications constituting books and records of the corporation, i.e., those that affect the corporation's rights, duties, and

---

[137] 2016 WL 767714.

[138] *Id*. at *6.

[139] *Id*. at *7 (internal citations omitted).

obligations, and (3) be sufficiently tailored to direct the Court to the specific books and records relevant to the director's proper purpose.[140]

With respect to the second element, the court cited *Estate of Polin v. Diamond State Poultry Co.* for the proposition that "documents subject to a Section 220 request are limited to 'those which were intended to reflect on the business, condition or legal rights of the corporation.'"[141]

Focusing on the second element of the *Chammas* test, the Company resists the production of emails and text messages from personal accounts and devices, arguing that "Schnatter is just curious about what his fellow fiduciaries were saying about him."[142] The Company would have a point if the custodians were required to produce documents referring to Schnatter without qualification. As discussed above, however, the court has limited the scope of the Company's production in response to Requests Nos. 1-4 to communications reflecting any consideration of changing Schnatter's relationship with the Company, including assessments of Schnatter's behavior or performance in his various roles at the Company, during the specified time period. Modified in this way, Requests Nos. 1-4 seek documents that satisfy the definition suggested in *Chammas* and the earlier precedent on which it relies for what constitutes books and records of a corporation for purposes of Section 220.

---

[140] *Id.* at *8 (internal citations omitted).

[141] *Id.* at *8 n.97 (quoting *Polin*, 1981 WL 7612, at *3 (Del. Ch. Apr. 14, 1981)).

[142] Def.'s Opening Br. 33.

A further word is in order regarding emails and text messages from personal accounts and devices. The reality of today's world is that people communicate in many more ways than ever before, aided by technological advances that are convenient and efficient to use. Although some methods of communication (*e.g.*, text messages) present greater challenges for collection and review than others, and thus may impose more expense on the company to produce, the utility of Section 220 as a means of investigating mismanagement would be undermined if the court categorically were to rule out the need to produce communications in these formats. Accordingly, I decline to adopt that approach.

In my view, consistent with the sentiments then-Chancellor Strine expressed in *Wal-Mart*, if the custodians identified here—the Company's other directors, CEO, and General Counsel—used personal accounts and devices to communicate about changing the Company's relationship with Schnatter, they should expect to provide that information to the Company.[143] That would apply not only to emails, but also to text messages, which in the court's experience often provide probative information. In so holding, I do not mean to suggest any form of a bright-line rule.

---

[143] According to Schnatter's counsel, the Company's directors do not have Company email addresses. Post-Trial Tr. 79. The Company has not suggested otherwise. Nor did the Company introduce at trial a policy indicating that it views any information from the personal accounts or on the personal devices of its directors or officers to be "personal unrestricted information" outside the control of the Company. *See Wal-Mart*, C.A. No. 7779-CS, at 97-98.

To the contrary, when considering requests for information from personal accounts and devices in Section 220 proceedings, the court should apply its discretion on a case-by-case basis to balance the need for the information sought against the burdens of production and the availability of the information from other sources, as the statute contemplates.[144]

### 2.    Privileged Communications

It is well-established under Delaware law that, subject to certain recognized limitations, a "director's right to information extends to privileged material."[145] Here, with one possible exception, no argument has been made that, to the extent the court finds that Schnatter is entitled to inspect books and records of the Company, his entitlement would not extend to privileged communications to which his fellow directors were privy.

The possible exception concerns documents involving communications with Akin Gump during the two-day period between July 13, 2018, when the firm was contacted to represent the yet-to-be-formed Special Committee, and the July 15 Meeting, when the Special Committee formally was established. This issue was the

---

[144] 8 *Del. C.* § 220(d) ("The Court may, in its discretion, prescribe any limitations or conditions with reference to the inspection, or award such other and further relief as the Court may deem just and proper."); *see also id.* § 220(c) (substantively identical provision for stockholder inspection demands).

[145] *In re CBS Corp. Litig.*, 2018 WL 3414163, at *4 (Del. Ch. July 13, 2018) (quoting *Kalisman v. Friedman*, 2013 WL 1668205, at *4 (Del. Ch. Apr. 17, 2013)).

subject of briefing, but it is unclear to the court whether the parties resolved the matter in reaching a resolution of Requests Nos. 5-17 of the Demand, which include a series of requests concerning the Special Committee. If the parties have not resolved this issue, they should so inform the court in connection with submitting a proposed form of order to implement this decision. Subject to this caveat, privileged communications responsive to Requests Nos. 1-4, as modified by the court, to which other directors of the Company were privy shall be produced to Schnatter.

## C. Conditions on Production

The Company argues that any production of documents to Schnatter that results from this action should only be made subject to entry of an order containing three conditions: that Schnatter be (1) required to comply with the Board's confidentiality policy; (2) prohibited from using any such documents in his Fiduciary Action or a future fiduciary action; and (3) prohibited from sharing any such documents with his counsel in this action.

With respect to the first proposed condition, the Company acknowledges that "Delaware law has long suggested that directors need not sign confidentiality agreements to obtain documents under Section 220."[146] Rather, there is a "presumption that the production of nonpublic corporate books and records to a

---

[146] Def.'s Opening Br. 47.

*stockholder* making a demand pursuant to Section 220 should be conditioned upon a reasonable confidentiality order."[147] This distinction is logical because directors, unlike stockholders, are fiduciaries who owe the corporation a duty to protect its information.[148] Given that Schnatter already is obliged as a fiduciary to protect the Company's information, and given that he confirmed during his trial testimony that he would abide by the Board's confidentiality policy with respect to any documents provided to him in this action,[149] I decline the Company's first request.[150]

With respect to the second proposed condition, as discussed above, Schnatter's counsel represented during post-trial argument that Schnatter would not use any documents produced in response to the Demand to assert a claim as a stockholder without first obtaining the Company's consent to do so. For the sake of clarity, the court will require that the parties include a provision formally documenting this representation in the implementing order.

---

[147] *Disney v. Walt Disney Co.*, 857 A.2d 444, 447 (Del. Ch. 2004) (emphasis added).

[148] *See* Edward P. Welch et al., 1 Folk on the Delaware General Corporation Law § 141.02[A], at 4-41 (6th ed. 2018) ("A director's duties include a duty to protect corporate information." (citing *Shocking Techs., Inc. v. Michael*, 2012 WL 4482838, at *9 (Del. Ch. Oct. 1, 2012))).

[149] Tr. 147-48; *see also* JX 35; JX 100.

[150] *See Holdgreiwe*, 1993 WL 144604, at *6 (commenting that conditioning a director's right to inspect books and records "on his entry into an agreement binding him not to disclose any of the information he obtains to any third parties . . . seems to me to add little. He is already under an obligation to maintain the confidences of Nostalgia . . . . Disclosure of such information . . . is a violation of duty whether or not an undertaking is entered.").

45

The last proposed condition concerns Schnatter's counsel in this action: Glaser Weil and his Delaware counsel, Bayard, P.A. Relying on this court's decisions in *Henshaw v. American Cement Corp.*[151] and *Holdgreiwe v. Nostalgia Network, Inc.*,[152] the Company argues that both firms should be prohibited from seeing any documents produced to Schnatter as a result of this action because those firms also represent him in the Fiduciary Action. The Company further argues that Glaser Weil should be prohibited in the same manner for the additional reason that the firm represents two women who have made sexual harassment allegations against Company management.[153]

In *Henshaw* and *Holdgreiwe*, the court barred a director from sharing corporate books and records *with other persons* (including their lawyers) who had interests adverse to the corporation.[154] Here, by contrast, the Company seeks to bar Schnatter from using *his own lawyers* to inspect the Company's books and records. I am not persuaded that Schnatter's own counsel should be barred because of the

---

[151] 252 A.2d 125 (Del. Ch. 1969).

[152] 1993 WL 144604.

[153] Tr. 153-54; JX 85.

[154] *See Henshaw*, 252 A.2d at 130 (prohibiting a director (Henshaw) from conducting an inspection using (i) a law firm that represented another director (Caldwell) in a lawsuit against the corporation and (ii) Caldwell's administrative assistant); *Holdgreiwe*, 1993 WL 144604, at *1, *7 (prohibiting a director (Holdgreiwe) from conducting an inspection using any professionals who had been employed by Concept Communications, Inc., which was engaged in a struggle for control of the corporation, or any of its affiliates "for any purpose other than this inspection of documents").

pendency of the Fiduciary Action from reviewing documents Schnatter is entitled to see himself as a director. Barring Schnatter's lawyers from helping him with the inspection would be prejudicial to Schnatter because it would require him to retain new counsel to perform that task. Furthermore, the risk that the documents could be used adversely to the Company can be mitigated by subjecting Schnatter's lawyers to the same use limitation to which he has consented, *i.e.*, not to use the documents to press a claim as a stockholder without first obtaining the Company's consent.

With respect to Glaser Weil's representation of the two alleged victims of sexual harassment, there is insufficient information in the record to permit the court to assess the nature and level of Glaser Weil's potential adversity to the Company based on this representation. The record also is insufficient to permit the court to assess whether or not any alleged conflict could be handled—as Glaser Weil contends it could—using ethical walls within the firm.[155] As such, the court will not bar Glaser Weil from assisting Schnatter based on its representation of these individuals. Of course, it will be incumbent upon Glaser Weil to take whatever measures are necessary to ensure compliance with its professional responsibilities.

---

[155] *See* Post-Trial Tr. 105, 109-10.

## IV.  CONCLUSION

For the reasons explained above, Schnatter is entitled to inspect documents responsive to Requests Nos. 1-4, as modified by the court, in accordance with this opinion.  The parties are directed to confer and submit an implementing order within five business days.

**IT IS SO ORDERED.**